UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DIANNA FINNEY,

       Plaintiff,

v.                          Civil Action No. 2:13-02778

MIG CAPITAL MANAGEMENT, INC.,

       Defendant.

MEMORANDUM OPINION & ORDER

       Pending are the plaintiff's motion for default judgment, filed August 12, 2013, and a motion filed on February 28, 2014 seeking to substitute Cindy Easter, in her capacity as Administratrix of the Estate of Dianna Finney, as the plaintiff in this case.

I.   Factual and Procedural Background

       Sometime prior to 2011, Dianna Finney ("Finney" or "the decedent"), incurred a debt to HSBC Bank d/b/a Home Bank ("HSBC") for an unspecified amount.  Compl. ¶ 9.  The complaint does not describe the precise nature of the debt, but Finney asserts that it was primarily for personal, family or household purposes.  Id.

       Beginning in 2011, Finney became unable to make minimum payments on her debt to HSBC.  Id.  Sometime thereafter,

also in 2011, MIG Capital Management ("MIG") began contacting Finney, attempting to collect the debt.  Id.  The complaint states that MIG undertook these efforts either on HSBC's behalf, or "because MIG purchased the account" from HSBC.  Id.

Finney retained The Palmer Firm, P.C. ("Palmer"), a law firm located in Dallas, Texas, in February 2012.  Id. ¶ 10. On or about February 23, 2012, Palmer sent a letter to MIG advising that Palmer represented Finney, demanding that MIG "immediately cease all attempts to contact" Finney, and requesting that any further correspondence regarding the debt be directed, in writing, to Palmer.  See Plaintiff's Motion for Default Judgment, Ex. B ("Palmer Letter").  According to the complaint, Palmer also sent a "demand letter alleging violations of the Federal Fair Debt Collection Practices Act" on May 11, 2012, Compl. ¶ 12; however, the complaint does not indicate to whom this second letter was addressed.[1]

Notwithstanding the February 23, 2012 letter, the complaint alleges that MIG continued to contact Finney "on several occasions" by calling her "home or cellular phone[.]" Id. ¶¶ 24, 28.  In an affidavit submitted in support of the pending motion for default judgment, Finney specifically claims

---

[1] The complaint stated that the demand letter was attached and incorporated by reference as Exhibit A; however, no letter was attached to the complaint.

that MIG called her approximately three times per week between February 23, 2012 and May 15, 2012, and claims that MIG was "oftentimes rude and aggressive, and frequently threatened to sue [her] with regard to the debt" during these calls.  See Plaintiff's Supplemental Motion for Default Judgment, Ex. A ("Finney Aff.") ¶¶ 7-9.

On February 15, 2013 Finney commenced this action.  In Count I, she claimed that HSBC violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq. ("FDCPA"), by placing harassing phone calls to her regarding the debt.  Compl. ¶¶ 13-18.  It appears that Finney intended to plead Count I against MIG as well.  Count I does not refer to MIG specifically at any point, see Compl. ¶¶ 13-18 ("First Cause of Action . . . Against Defendants HSBC Bank Nevada . . . and Household Bank"); id. ¶ 16 ("Defendants, HSBC . . . and Household Bank[,] violated The Federal Fair Debt Collection Practices Act"), but the complaint does request damages under the FDCPA against all defendants, see id. ¶ 18 ("As a result of each and every [defendant's] violations of the FDCPA, [plaintiff is] entitled to actual damages . . . statutory damages . . . and reasonable attorney's fees and costs[.]" (emphasis added)); id. at Prayer for Relief (requesting an award of actual and statutory damages against "each and every [d]efendant" under the FDCPA), and other

3

language in the complaint suggests that Finney did intend to plead Count I against MIG, see id. ¶ 5 (alleging that "MIG was a debt collector pursuant to 15 U.S.C. [§] 1692a(6)).

In Count II, Finney asserted a claim for "tort in se" against HSBC and MIG.  Id. ¶¶ 19-20.  The remainder of the complaint charged MIG alone with violations of the West Virginia Consumer Credit Protection Act ("WVCCPA") (Count III); invasion of privacy (Count IV); and negligent and intentional infliction of emotional distress (Counts V and VI, respectively).  Id. ¶¶ 21-34.

HSBC was dismissed from this case with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) on April 5, 2013.  The Secretary of State accepted service of process on MIG's behalf on March 26, 2013, and the Secretary's website indicates that MIG's registered agent signed for a certified mailing of the complaint on March 28, 2013.  MIG has not, however, answered the complaint nor made any appearance in this matter.  As a result, Finney first moved for default judgment against MIG on May 16, 2013.  In an order dated May 20, 2013, the court denied the motion, noting that MIG's default had not yet been entered by the Clerk.  In response, on July 23, 2013, Finney moved for an entry of default, and the Clerk entered default on July 24, 2013.  Thereafter, on August 12,

4

2013, Finney renewed her motion for default judgment against MIG. She sought statutory damages in the amount of $141,000[2] for thirty violations of section 46A-2-128(e) of the WVCCPA, an order extinguishing her debt, an unspecified additional amount of damages to be determined based on evidence yet to be presented, and attorney's fees and costs. See Plaintiff's Motion for Default Judgment ("Mot. Default") at 1-2. In her brief in support of the motion for default, Finney also suggested that MIG was liable, generally, for violations of the FDCPA and for the common law torts of invasion of privacy and infliction of emotional distress. Plaintiff's Memorandum of Law in Support of Motion for Default Judgment ("Default Mem.") at 7. Finney noted that her damages on those latter theories of liability could not be reduced to a sum certain, and therefore requested "that a hearing be conducted to determine the amount of damages that [Finney wa]s entitled to . . . for the claims she assert[ed] in addition to those violations of the [WVCCPA.]" Id. at 7-8.

On November 15, 2013, the court held an evidentiary hearing in order to allow Finney to submit evidence and argument

---

[2] The plaintiff's motion for default judgment requests $114,000, but her memorandum of law in support of that motion requests $141,000. The plaintiff asserts that she is entitled to $4,700 for each of the thirty alleged violations of the WVCCPA, which would result in a total damages award of $141,000.

in support of her request for a default judgment.  The plaintiff
was not present at the hearing, and no evidence was submitted.
Counsel for the plaintiff did appear, however, and he clarified
that, as a practical matter, Finney was seeking default judgment
solely on the basis of her Count III claim for violations of the
WVCCPA:

> THE COURT: Let me ask, as well, whether or not the
> plaintiff seeks judgment as a practical matter on
> anything other than the violation of the West Virginia
> statute in [§] 128(e).
> MR. COOK:    Your Honor, as a practical matter, the
> plaintiff does not seek further recovery.

Hearing Transcript at 8:12-20, Finney v. MIG Capital Mgmt.,
Inc., No. 13-2778 (S.D. W. Va. Nov. 15, 2013).  The court
continued the hearing until 2:30 p.m. on November 21, 2013 in
order to afford Finney further opportunity to offer testimony
and additional evidence concerning the appropriate damages
award.  See id. at 8:21-9:6 (noting the substantial range of
statutory damages available under the WVCCPA and indicating that
testimony and further detail could be relevant to the damages
calculation).

     Prior to the rescheduled hearing, Finney's attorney
advised the court that the plaintiff's absence at the November
15, 2013 hearing was the result of ongoing medical issues, and
requested that the hearing be further continued for one month.
In an order dated November 21, 2013, the court assented to that

request and continued the hearing to December 18, 2013.  On
December 17, 2013, however, Finney's attorney advised the court
that his client's medical condition had not improved, and that
Finney would not be able to appear at the hearing scheduled for
the following afternoon.  In response, the court once again
continued the evidentiary hearing to January 24, 2014.

On January 22, 2014, the court received word that
Finney had, unfortunately, died.  Thereafter, on February 28,
2014, Cindy Easter, in her capacity as Administratrix of the
Estate of Dianna Finney ("the Estate"), filed a statement
formally noting Finney's death on the record in accordance with
Federal Rule of Civil Procedure 25(a).  The Estate also filed on
that same day a motion seeking to replace Finney as the
plaintiff in this matter.[3]  MIG, as has been its custom
throughout these proceedings, has not responded in any way to
the motion to substitute.

---

[3] The motion to substitute is phrased as though it were filed on
Finney's behalf.  This is, of course, no longer practically
possible due to Finney's unfortunate death, but it is also not
legally permissible because counsel's authority to act on behalf
of a client is extinguished when the client dies.  Coppinger v.
Schantag, No. 05-2380, 2006 WL 38946, at *1 (D. Md. Jan. 5,
2006) (noting that "under well-established principles of agency
law, an agent's authority terminates upon the death of a
principal" (internal quotation marks and citation omitted)).
Finney's former counsel has, however, entered an appearance on
behalf of the Estate, and the court will therefore construe the
motion as though it were submitted on behalf of the Estate.

## II.  Motion to Substitute

The substitution of a successor or representative to replace a deceased party is governed by Rule 25(a) of the Federal Rules of Civil Procedure, which provides, in relevant part, as follows:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party.  A motion for substitution may be made by any party or by the decedent's successor or representative.

Fed. R. Civ. P. 25(a); see also Fariss v. Lynchburg Foundry, 769 F.2d 958, 961 (4th Cir. 1985) ("Rule 25(a)(1) governs substitution of the proper successor or representative of a deceased party[.]").  As the text of the rule indicates, a motion to substitute raises two primary questions: First, whether the decedent's claims survive death; and, second, whether the party to be substituted is a "proper" party.

A. Survival

The court must first determine whether Finney's claims survive her death.  Not every claim pled in the complaint is relevant to this step in the analysis, because, as noted, Finney, by counsel, indicated at the hearing on November 15, 2013, that she intended to pursue default judgment solely on the

8

basis of her Count III claim under the WVCCPA.  In its motion to substitute, the Estate espouses a slightly different view, conceding that "the statutory claims represent the gravamen" of the motion for default," Motion to Substitute ("Mot. Substitute") at 2 n.1, but suggesting that both the Count I and Count III "claims against the [d]efendants brought under the FDCPA and WVCCPA" are relevant and "survive [Finney's] death," id. ¶ 21.

For present purposes, the court will consider whether the Count I claim under the FDCPA and the Count III claim under the WVCCPA survived Finney's death.  As one might expect, federal law governs survival where a federal claim is presented, Fariss, 769 F.2d at 962 n.3, while the survival of state-law claims is a matter of state law, Knauer v. Johns-Manville Corp., 638 F. Supp. 1369, 1387 (D. Md. 1986).

In view of plaintiff's limitation of recovery to Counts I and III, the remaining Counts II, IV, V, and VI are deemed abandoned.

### 1. Count I - FDCPA Claim

With respect to the FDCPA claim, survival is a question of federal common law, unless the statute suggests otherwise.  United States v. NEC Corp., 11 F.3d 136, 137 (11th Cir. 1993); Smith v. Dep't of Human Servs., 876 F.2d 832, 834-35 (10th Cir. 1989); James v. Home Constr. Co. of Mobile, Inc., 621 F.2d 727, 729 (5th Cir. 1980); Cook v. Hairston, 948 F.2d 1288 (6th Cir. 1991) (table decision); cf. Carlson v. Green, 446 U.S. 14, 23 (1980) ("Bivens actions are a creation of federal law and, therefore, the question whether respondent's action survived Jones' death is a question of federal law.").  The FDCPA is silent regarding the survival of claims, so the court will look to the general common law rule, which provides that claims that are remedial in nature survive the claimant's death, while claims that are penal in nature do not.  Faircloth v. Finesod, 938 F.2d 513, 518 (4th Cir. 1991) (describing the federal common law rule).  Whether a claim is remedial or penal is determined by reference to three factors: (1) whether the statute was designed to redress harms to individuals or harms to the public; (2) whether recovery accrues to the individual or to the public; and (3) whether the recovery is proportional to the harm suffered.  E.g., Murphy v. Household Fin. Corp., 560 F.2d

206, 209 (6th Cir. 1977); <u>Green v. City of Welch</u>, 467 F. Supp. 2d 656, 665-66 (S.D. W. Va. 2006).

Here, all three factors suggest that claims under the FDCPA are remedial, rather than penal.  Regarding the first factor, the statutory text of the FDCPA clearly indicates that it was designed to protect individuals.  For example, the Congressional findings and declaration of purpose accompanying the bill note that abusive debt collection practices "contribute to . . . personal bankruptcies, to martial instability, to the loss of jobs, and to invasions of individual privacy."  15 U.S.C. § 1692(a).  Moreover, Congress indicated that the FDCPA was necessary because "[e]xisting laws and procedures for redressing th[o]se injuries [we]re inadequate," and clarified that the purpose of the FDCPA was to "protect consumers against debt collection abuses."  15 U.S.C. § 1692(b), (e).  With respect to the second factor, § 1692k indicates that FDCPA damages are designed to redress harms to individuals, rather than harms to the general public.  Specifically, that section provides that "any debt collector who fails to comply" with the FDCPA "with respect to any <u>person</u> is liable to <u>such person</u> in an amount equal to the sum of . . . any actual damages sustained by <u>such person</u> as a result of such failure[.]"  15 U.S.C. § 1692k(a)(1) (emphases added).  Finally, the text of the statute

11

also demonstrates that recovery under the FDCPA is designed to be proportional to the harm suffered.  For example, § 1692k(b) provides that "[i]n determining the amount of liability in any action" by an individual, "the court shall consider . . . the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional[.]"  See 15 U.S.C. § 1692k(b)(1).  And, while it is true that the FDCPA also provides for statutory damages not to exceed $1,000, the award of such damages is tied to the conduct of the debt collector.  Compare Frazier v. Absolute Collection Serv., Inc., 767 F. Supp. 2d 1354, 1365-66 (N.D. Ga. 2011) (imposing statutory maximum of $1,000 in damages for repeated, willful violations of FDCPA), with Weiss v. Zwicker & Assocs., P.C., 664 F. Supp. 2d 214, 218 (E.D.N.Y. 2009) (awarding $500 in statutory damages where violations were technical, rather than intentional).

In sum, all three factors suggest that claims under the FDCPA are remedial rather than penal, and, accordingly, Count I survives Finney's death.  See Jewett v. Bishop, White Marshall & Weibel, P.S., No. 12-10142, 2013 WL 6818245, at *2-3 (C.D. Cal. Feb. 25, 2013) (holding that FDCPA claim survived plaintiff's death); Bracken v. Harris & Zide, L.L.P., 219 F.R.D.

481, 481-85 (N.D. Cal. 2004) (holding that FDCPA claim survived

defendant's death).

### 2. Count III - WVCCPA Claim

The survival of claims under West Virginia law is

governed by a combination of common law precedent and statute.

Specifically, West Virginia Code § 55-7-8a(a) states that,

> [i]n addition to the causes of action which survive at
> common law, causes of action for injuries to property,
> real or personal, or injuries to the person and not
> resulting in death, or for deceit or fraud, also shall
> survive; and such actions may be brought
> notwithstanding the death of the person entitled to
> recover or the death of the person liable.

W. Va. Code § 55-7-8a(a).  Section 55-7-8a(b) further provides

that, "[i]f any such action is begun during the lifetime of the

injured party . . . and such injured party dies pending the

action it may be revived in favor of the personal representative

of such injured party and prosecuted to judgment[.]"  Id. § 55-

7-8a(b).  Finally, section 55-7-8a(f) clarifies that "[n]othing

contained in [section 55-7-8a(a)] shall be construed to extend

the time within which an action for any other tort shall be

brought[.]"  Id. § 55-7-8a(f).  Read together, these sections

indicate that, in cases like this one, the personal

representative of a deceased plaintiff may revive a cause of

action if the claims of the deceased plaintiff would have

13

survived at common law, or if those claims fall within the
enumerated categories of actions that survive under section 55-
7-8a(a).

       In this case, Count III alleges that MIG violated
section 128(e) of the WVCCPA, which prohibits a debt collector
from communicating with a consumer who is represented by
counsel.  W. Va. Code § 46A-2-128(e).  That claim is a statutory
creation of relatively recent vintage, and common law principles
of survival are therefore inapplicable.  Cf. Wilt v. State Auto.
Mut. Ins. Co., 506 S.E.2d 608, 614 (W. Va. 1998) ("Given its
recent statutory genesis, an unfair settlement practices claim
clearly did not survive at common law[.]").  Instead, the
relevant question is whether a claim under section 128(e)
survives under the remaining terms of section 55-7-8a(a) because
it can be characterized as a claim for an injury to real or
personal property, a claim for a non-fatal personal injury, or a
claim for deceit or fraud.  See W. Va. Code § 55-7-8a(a).  The
Supreme Court of Appeals of West Virginia has noted that the
"broad terminology" of the survival statute provides relatively
little guidance concerning the "types of causes of action [that]
will survive."  See Stanley v. Sewell Coal Co., 285 S.E.2d 679,
683 (W. Va. 1981).  Nevertheless, the court must assess whether
a claim survives by "apply[ing] the general terms [of the

14

statute] to the particular case," and "determining whether a particular cause of action fits into one of the[] broad categories" of actions enumerated in section 55-7-8a(a).  See id.

Finney's Count III claim cannot be characterized as an injury to property or a personal injury.  Nothing in Count III implicates an interest in property, and section 128(e)'s prohibition on contacting consumers bears no resemblance to causes of action such as trespass or conversion that would ordinarily ameliorate an injury to property.  Similarly, "the term 'personal injury' historically has referred to physical injuries to the person such as an automobile accident, slip and fall, etc.," Wilt, 506 S.E.2d at 612, and decisions from the Supreme Court of Appeals of West Virginia suggest that personal injury claims that survive under section 55-7-8a(a) must be at least tangentially linked to a physical injury, see id. at 612-13 (holding that statutory claim for unfair settlement practices is not a "personal injury"); Courtney v. Courtney, 437 S.E.2d 436, 437-43 (W. Va. 1993) (holding that infliction of emotional distress was a "personal injury" where it arose out of assault and battery witnessed by plaintiff).  In contrast, claims based on purely dignitary injuries unrelated to any physical harm apparently do not survive.  See Wilt, 506 S.E.2d at 613

15

("Numerous torts such as libel, defamation, false arrest, false imprisonment, and malicious prosecution . . . . do not fall within the realm of personal injury[, and] . . . do not survive the death of a party."). The complaint does not suggest that Count III is linked in any way to any sort of physical injury caused by or related to MIG's debt-collection calls, therefore Count III cannot be characterized as a claim for a personal injury.

That leaves only section 55-7-8a(a)'s remaining category of claims for fraud or deceit. Unfortunately, case law from this State provides no clear answer concerning the manner in which this provision of the statute should be interpreted and applied. In Stanley v. Sewell Coal Co., 285 S.E.2d 679 (W. Va. 1981), the Supreme Court of Appeals suggested that a claim can be characterized as an action for fraud or deceit if it is sufficiently "analogous to" or "clearly compatible with" the broad, general principles underpinning fraud claims. In that case, the plaintiff sued for retaliatory discharge, alleging that he was fired in order to prevent the discovery of his employer's "false reporting of accidents to the Mine Enforcement Safety Administration." Id. at 681. As the court explained, a claim for retaliatory discharge is based on the "underlying rationale" that "where the employer's motivation for

[discharging an employee] is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge." Id. at 682 (quoting Syl. Pt. 1, Harless v. First Nat'l Bank in Fairmont, 246 S.E.2d 270 (W. Va. 1978)). Although the court acknowledged that the cause of action "did not expressly utilize fraud concepts," it nevertheless concluded that retaliatory discharge claims could be characterized as a specie of "constructive fraud," which the court described as "a breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." Id. at 682-83. In effect, the court reasoned that "constructive fraud closely parallels [a claim for] wrongful discharge," inasmuch as both causes of action are designed to provide a remedy for conduct that, "although not actually fraudulent, ought to be so treated," because it "contravene[s] a substantial public policy principle." Id. at 683 ("The law indulges in an assumption of fraud for the protection of valuable social interests based upon an enforced concept of confidence, both public and private.").

In a more recent decision, however, the Supreme Court of Appeals appeared to retreat from the expansive interpretative

17

method articulated in Sewell Coal, suggesting instead that a
claim would only be considered an action for "fraud" within the
meaning of section 55-7-8a(a) if it contained "those elements
necessary to prove fraud" at common law.  See Wilt v. State
Auto. Mut. Ins. Co., 506 S.E.2d 608, 610-12 (W. Va. 1998).  As
earlier noted, in Wilt, the plaintiffs attempted to characterize
a statutory tort claim for unfair settlement practices made
pursuant to the West Virginia Unfair Trade Practices Act
("UTPA") as a claim for fraud.  The court acknowledged that
certain conduct proscribed by the UTPA might resemble the
"traditionally recognized elements of a fraud claim," but
ultimately rejected the analogy, reasoning that "[v]iewing
claims under the [UTPA] as necessarily fraudulent in nature
[wa]s problematic . . . because the type of conduct that
constitutes an unfair settlement claim may include a variety of
factual scenarios which lack the requisite elements of a fraud
claim."  Id. at 610-11.  Specifically, the court explained that
while the UTPA prohibited outright "misrepresentation or
deception" in claims settlement, it also created rules designed
to foster timely and fair claims-processing standards that were
not "aimed strictly at the elimination of conduct that is
fraudulent in character."  Id. at 611-12.  As a result, the
court concluded that claims under the UTPA did not survive under
section 55-7-8a(a) because they did not "expressly fall[] within

18

the classification of property damage, personal injury, or fraud or deceit."[4]  See id. at 613-14.  In doing so, the court did not discuss or overrule Sewell Coal directly; however, the court did reference and disapprove of an unpublished federal district court decision that relied on Sewell Coal to reach the conclusion "that claims alleging unfair settlement practices [we]re analogous to constructive fraud."  Id. at 612-14.

     "When there is no case law from the forum state which is directly on point, the district court attempts to do as the state court would do if confronted with the same fact pattern."  Roe v. Doe, 28 F.3d 404, 407 (4th Cir. 1994).  Here, the dissonance between Sewell Coal and Wilt leaves the court without a clear answer.  The former suggests that a claim survives if it resembles a claim for common law fraud; the latter indicates that only actual common law fraud claims survive.  In this case, however, the court is persuaded that the Supreme Court of Appeals would apply the approach articulated in Wilt to claims made under the WVCCPA for two reasons.

---

[4] Wilt specifically held that "claims involving unfair settlement practices that arise under the [UTPA] are governed by the one-year statute of limitations set forth in West Virginia Code § 55-2-12(c)."  Wilt, 506 S.E.2d at 614.  But that determination was predicated upon the conclusion that "survivability -- either common law or statutory -- [] determines the applicable limitations period[.]"  Id.

First, although Sewell Coal suggested that the
survival statute was "remedial in nature" and therefore to be
"liberally construed," the majority of cases interpreting
section 55-7-8a(a) appear to adopt a considerably more
conservative approach.  For example, earlier in Snodgrass v.
Sisson's Mobile Home Sales, Inc., 244 S.E.2d 321 (W. Va. 1978),
the court stated that "the statutory survivability created by
[section 55-7-8a(a)] is limited to the causes of action
designated therein," and emphasized that "the Legislature
intended to exclude . . . other personal tort actions" from
"statutory survivability[.]"  Id. at 325.  The court explained
that this narrow interpretation of section 55-7-8a(a) was
further confirmed by the text of section 55-7-8a(f), which
"specifically limit[s] the survivability of personal tort
actions to those set out in [section 55-7-8a(a)] by the words,
'Nothing contained in this section shall be construed to extend
the time within which an action for any other tort shall be
brought.'"  Snodgrass, 244 S.E.2d at 325 (quoting W. Va. Code §
55-7-8a(f)).  In Slack v. Kanawha County Housing and
Redevelopment Authority, 423 S.E.2d 547 (W. Va. 1992), the court
applied that narrow understanding of the survival statute and
concluded that "invasion of privacy [wa]s a personal action that
d[id] not survive the death of the individual . . . under
[section 55-7-8a(a)]" because it was not one of the causes of

action specifically articulated in the survival statute.  Id. at 551.

     Other cases have construed the survival statute through a similarly narrow lens.  See, e.g., Cavendish v. Moffitt, 253 S.E.2d 558, 559 (W. Va. 1979) (per curiam) (reiterating that the Legislature intended to exclude certain claims from the scope of the survival statute and holding that a claim for libel "lack[s] statutory survivability" under section 55-7-8a(a)).  It appears that the court in Wilt aligned with these cases when it emphasized that it was "[o]nly through express statutory designation [that] fraud and deceit survive the death of the victim."  Wilt, 506 S.E.2d at 613.  Wilt's conclusion that claims do not survive unless they "expressly fall[] within the classification of property damage, personal injury, or fraud or deceit," id., appears to reflect the dominant interpretive approach.

     Second, in the few instances where the court has shown any willingness to apply a more relaxed interpretation of section 55-7-8a(a), it has done so in cases involving common-law, rather than statutory, claims.  See, e.g., Courtney v. Courtney, 437 S.E.2d at 437-43 (holding that intentional infliction of emotional distress was a "personal injury" within the meaning of the survival statute); Sewell Coal, 285 S.E.2d at

21

682-83 (holding that claim for retaliatory discharge survived).
By contrast, the Supreme Court of Appeals has been particularly
reluctant to find that statutory tort claims survive under
section 55-7-8a(a).  For example, in Snodgrass, the court
summarily concluded that an action to collect a civil penalty
under the State's usury statute did "not fall within the
categories of causes of action which survive by virtue of"
section 55-7-8a(a).  244 S.E.2d at 325-26.  And in Thompson v.
Branches-Domestic Violence Shelter of Huntington, W. Va., Inc.,
534 S.E.2d 33 (W. Va. 2000), the court similarly held that "the
tort of breach of confidentiality in violation of a statute" did
not fall within the categories of claims enumerated in section
55-7-8a(a).  Id. at 38-39.  Given that Count III is a statutory
tort akin to the causes of action at issue in Snodgrass,
Thompson, and Wilt, it seems likely that the Supreme Court of
Appeals would apply Wilt's narrow interpretation of the survival
statute in this case.

          Construing the survival statute's definition of fraud
narrowly, Count III does not survive.  As the court in Wilt
explained,

          The essential elements in an action for fraud are: (1)
          that the act claimed to be fraudulent was the act of
          the defendant or induced by him; (2) that it was
          material and false; that plaintiff relied on it and
          was justified under the circumstances in relying upon

22

it; and (3) that he was damaged because he relied on it.

Wilt, 506 S.E.2d at 610 (quoting Syl. Pt. 2, Muzelak v. King Chevrolet, Inc., 368 S.E.2d 710 (W. Va. 1988)).  By contrast, section 128(e) of the WVCCPA prohibits "[a]ny communication with a consumer whenever it appears that the consumer is represented by an attorney[.]"  W. Va. Code § 46A-2-128(e).  This court has previously recognized that section 128(e) is designed in part to prevent "a skilled and deceptive [debt] collector from accomplishing an end-run around counsel to the client's potentially severe detriment," Lenhart v. EverBank, No. 12-4184, 2013 WL 5745602, at *8-9 (S.D. W. Va. Oct. 23, 2013), but that alone is not enough to transform a claim under section 128(e) into a claim for fraud.  Cf. Martin v. State Farm Mut. Auto. Ins. Co., No. 10-144, 2010 WL 3852337, at *3-4 (S.D. W. Va. Sept. 30, 2010) ("Plaintiff . . . has not alleged fraud or deceit or personal injury claims, and the underlying fraud and deceit components to the common-law bad faith and UTPA claims do not transform them into such claims.").  Indeed, to plead a violation of section 128(e) the plaintiff need-not -- and Finney did not -- allege any false statements on the part of the debt-collector or any detrimental reliance on the part of the consumer.

23

As the court in _Wilt_ noted, certain deceptive practices may be prohibited by statute because they are unfair, without necessarily amounting to fraud.  _Wilt_, 506 S.E.2d at 610-11 ("Viewing claims under the [UTPA] as necessarily fraudulent is problematic . . . because the type of conduct that constitutes an unfair settlement claim may include a variety of factual scenarios which lack the requisite elements of a fraud claim.").  The same is true here.  It may be "unfair or unconscionable" for a debt collector to contact directly a consumer known to be represented by counsel.  W. Va. Code § 46A-2-128(e).  But that statutory designation does not transform the underlying conduct into a common law claim for fraud.

Accordingly, Count III does not survive Finney's death.

B. Proper Party

Having determined that Count I survives Finney's death, the court next considers whether the Estate is a proper party to be substituted.  No significant analysis is required.  As noted, Rule 25 provides that "[a] motion for substitution may be made by any party or by the decedent's successor or representative."  Fed. R. Civ. P. 25(a)(1).  "[C]ourts are in

24

agreement that the 'successor or representative' mentioned in Rule 25(a)(1) refers to the administrator of the estate[.]" Susko v. City of Weirton, No. 09-1, 2010 WL 2925937, at *2 (N.D. W. Va. July 22, 2010). Accordingly, Ms. Easter, as administratrix for the Estate, is a proper party for substitution. Ashley v. Ill. Cent. Gulf R.R. Co., 98 F.R.D. 722, 724 (S.D. Miss. 1983) ("Unless the estate of a deceased party has been distributed at the time of making the motion for substitution, the 'proper' party for substitution would be either the executor or administrator of the estate of the deceased."); accord Rende v. Kay, 415 F.2d 983, 985 (D.C. Cir. 1969) (explaining that the text of Rule 25 "plainly contemplate[s] that the suggestion [of death] emanating from the side of the deceased would identify a representative of the state, such as an executor or administrator, who could be substituted for the deceased as a party[.]").

*     *     *

In sum, Count I survives Finney's death, and the Estate is a proper party for substitution. Accordingly, the motion to substitute the Estate as plaintiff in this action is granted as to Count I.

III. Motion for Default Judgment

A. Standard of Review

Default judgments are governed by Rule 55 of the
Federal Rules of Civil Procedure.  Rule 55(a) states that if a
party has "failed to plead or otherwise defend, and that failure
is shown by affidavit or otherwise, the clerk must enter the
party's default."  Once default has been entered by the clerk,
the plaintiff may move the court to enter a default judgment
against the defendant pursuant to Rule 55(b)(2).

When considering a motion for a default judgment, the
court accepts the well-pleaded factual allegations in the
complaint regarding liability as true.  See Ryan v. Homecomings
Fin. Network, 253 F.3d 778, 780-81 (4th Cir. 2001).
Nevertheless, "liability is not deemed established simply
because of default . . . and the court, in its discretion, may
require some proof of the facts that must be established in
order to determine liability."  Int'l Painters & Allied Trades
Indus. Pension Fund v. Capital Restoration & Painting Co., 919
F. Supp. 2d 680, 684 (D. Md. 2013)(quoting Charles A. Wright,
Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure §
2688 (3d ed. 1998)).

26

Once liability has been established, the court must make an independent determination concerning the damages to be awarded.  See S.E.C. v. Lawbaugh, 359 F. Supp. 2d 418, 422 (D. Md. 2005); see also Ryan, 253 F.3d at 780-81.  Courts will not simply accept the plaintiff's statement of damages, but instead must ensure that damages are appropriate.  Adams v. Barker, No. 10-423, 2013 WL 310561, at *3 (S.D. W. Va. Jan. 25, 2013) (citing Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997)).  To this end, Rule 55(b) authorizes the court to "conduct hearings or make referrals" in order to, inter alia, "determine the amount of damages[,] establish the truth of any allegation by evidence[,] or investigate any other matter."  Fed. R. Civ. P. 55(b).  The court may also rely on affidavits and other documentary evidence to determine the appropriate damages amount.  Monge v. Portofino Ristorante, 751 F. Supp. 2d 789, 795-96 (D. Md. 2010).

B. Discussion

As noted, the Estate maintains that "the statutory claims represent the gravamen of" the pending motion for default judgment; Mot. Substitute at 2 n.1, however, only the Count I claim under the FDCPA survived Finney's death.

27

### 1. Liability

"To prevail on a FDCPA claim, a plaintiff must sufficiently allege that (1) [s]he was the object of collection activity arising from a consumer debt as defined by the FDCPA, (2) the defendant is a debt collector as defined by the FDCPA, and (3) the defendant engaged in an act or omission prohibited by the FDCPA." Johnson v. BAC Home Loans Servicing, LP, 867 F. Supp. 2d 766, 776 (E.D.N.C. 2011).

With respect to the first element, a consumer debt is defined as an obligation or alleged obligation "to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes[.]" 15 U.S.C. § 1692a(5). In this case, the complaint states that Finney "incurred a financial obligation that was primarily for personal, family or household purposes," Compl. ¶ 9, and that "MIG attempt[ed] to collect" on that debt on several occasions, id. ¶¶ 9, 32-33. As a result, the well-pleaded facts in the complaint establish that Finney was the object of collection activity arising from a consumer debt as defined by the FDCPA.

Regarding the second element, the FDCPA defines a debt collector as:

28

> any person who uses any instrumentality of interstate
> commerce or the mails in any business the principal
> purpose of which is the collection of any debts, or
> who regularly collects or attempts to collect,
> directly or indirectly, debts owed or due or asserted
> to be owed or due another.

15 U.S.C. § 1692a(6).  Here, it appears that MIG is a debt
collector within that definition inasmuch as the complaint
establishes that MIG is a Florida company engaged in the
principal business of debt collection; that MIG used the mail
and telephone to engage in debt collection; and that MIG
attempted to collect Finney's debt "on behalf of HSBC[.]"
Compl. ¶¶ 5, 9.

As for the third element, the complaint appears to
assert that MIG violated the FDCPA by engaging in "conduct the
natural consequence of which [wa]s to harass, oppress, or abuse
[Finney] in connection with collecting the alleged debt."
Compl. ¶ 16; see also id. ¶ 18 (asserting that Finney is
entitled to damages "[a]s a result of each and every
[d]efendant's violations of the FDCPA").  Section 1692d of the
FDCPA prohibits debt collectors from engaging in "any conduct
the natural consequence of which is to harass, oppress, or abuse
any person in connection with the collection of a debt."
15 U.S.C. § 1692d.  That statute includes a non-exhaustive list
of conduct that constitutes harassment, oppression or abuse,
including, among other things, "[c]ausing a telephone to ring or

29

engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass." Id. § 1692d(5).

There is no bright-line test for determining whether debt-collection calls constitute actionable harassment. Rather, courts weigh and consider a number of factors, including the frequency, pattern, and nature of the calls, to determine whether they violate § 1692d(5). See Bassett v. I.C. Sys., Inc., 715 F. Supp. 2d 803, 809-10 (N.D. Ill. 2010) ("[A]ctionable harassment or annoyance turns on the volume and pattern of calls made[.]" (internal citations and quotation marks omitted)); Akalwadi v. Risk Mgmt. Alternatives, Inc., 336 F. Supp. 2d 492, 505-06 (D. Md. 2004) (same); Joseph v. J.J. Mac Intyre Cos., LLC, 238 F. Supp. 2d 1158, 1168 (N.D. Cal. 2002) (same); see also Bridge v. Ocwen F. Bank, FSB, 681 F.3d 355, 363 (6th Cir. 2012) (considering it relevant, at motion to dismiss stage, that debt collector ignored repeated requests to cease communications with consumer); Fox v. Citicorp Credit Servs., Inc., 15 F.3d 1507, 1516 (9th Cir. 1994) ("Threatening and intimidating calls to a consumer at an inconvenient time or place could rationally support a jury finding of harassing conduct.").

In some instances, the sheer volume of debt collection calls may be sufficient to establish a violation.  Compare, e.g., Hoover v. Monarch Recovery Mgmt., Inc., 888 F. Supp. 2d 589, 597-99 (E.D. Pa. 2012) (holding that ten calls per week for eleven week period was sufficient volume of calls to state a claim under § 1692d(5)), with, e.g., Breeders v. Gulf Coast Collection Bureau, 796 F. Supp. 2d 1335, 1338 (M.D. Fla. 2011) (holding that calls placed between 8:00 a.m. and 11:00 a.m. no more than once every two days did not violate FDCPA).  But the requisite "intent to annoy, abuse, or harass" on the part of the debt collector may also be inferred from other conduct, such as continuing to place calls to a consumer who has asked not to be contacted, Gilroy v. Ameriquest Mortg. Co., 632 F. Supp. 2d 132, 136 (D.N.H. 2009); or engaging in a course of conduct -- such as contacting a consumer known to be represented by counsel -- that would constitute a violation of some separate section of the FDCPA, cf. Fox, 15 F.3d at 1516 n.10 (holding that conduct that would violate § 1692c would be "relevant to a harassment claim" under § 1692d).

In this case, the well-pleaded facts in the complaint establish that Finney retained Palmer to represent her in her efforts to resolve her debt to HSBC; that Palmer notified MIG that it represented Finney in February of 2012; and that MIG

thereafter continued to communicate with Finney by calling her "home or cellular telephone on numerous occasions after a notice of representation . . . had been received by" MIG.  Compl. ¶¶ 10, 11, 24, 28.  In an affidavit submitted in support of her motion for default judgment, Finney clarified that Palmer "sent a letter dated February 23, 2012 to [MIG] in which, among other things, it was communicated on [her] behalf that the debt was disputed and that [MIG] and its representatives should cease all communications with [her] directly and[,] instead, direct all communication related to the debt to" Palmer.  Finney Aff. ¶ 6.  Finney further explained that MIG "ignored [her] request and continued calling [her] directly with regard to the debt . . . . approximately three times per week" between February 23, 2012 and May 15, 2012, at which point MIG's calls "eventually ceased[.]"  Finney Aff. ¶¶ 7, 9.  Finally, Finney also stated that these callers were "oftentimes rude and aggressive, and frequently threatened to sue [her] with regard to the debt."  Finney Aff. ¶ 8.

        Taken together, the well-pleaded facts in the complaint and the supplementary information contained in Finney's affidavit are sufficient to establish a violation of § 1692d(5).  MIG continued to contact Finney approximately three times per week for over eleven weeks after Palmer's letter,

aggregating thirty-three or more telephone calls.  Although this call volume alone might not indicate an intent to annoy, abuse, or harass in violation of § 1692d(5), the fact that these calls were placed after Finney informed MIG that the debt was disputed and after Finney requested that all further communication be directed to Palmer suggests otherwise.  Indeed, MIG's conduct in this regard would be sufficient to establish independent violations of § 1692c(a)(2), which prohibits communication with a consumer "if the debt collector knows the consumer is represented by an attorney with respect to such debt," 15 U.S.C. § 1692c(a)(2), as well as § 1692c(c), which prohibits a debt collector from communicating with a consumer if the consumer indicates, in writing, that he or she "wishes the debt collector to cease further communication," id. § 1692c(c).  Although Finney did not allege violations of either of those two sections of the FDCPA, the Ninth Circuit has recognized that such "conduct may be relevant to a harassment claim" under § 1692d(5), "even [in the] absen[ce] of a separate [§] 1692c claim[.]" Fox, 15 F.3d at 1516 & n.10.  Likewise, courts have concluded that a debt collector's failure to respect a consumer's request to cease communications concerning a debt may be indicative of intent to harass or annoy.  See, e.g., Gilroy, 632 F. Supp. 2d at 136 ("Intent may also be inferred by evidence that the debt collector continued to call the debtor after the

33

debtor had asked not to be called[.]"). Accordingly, given that Finney asked MIG to stop contacting her and directed all further communications regarding the debt to Palmer, the fact that MIG nevertheless continued to call her on over thirty occasions is sufficient to establish a violation of § 1692d(5). See Harmon v. Virtuoso Sourcing Grp., LLC, No. 11-334, 2012 WL 4018504, at *4 (S.D. W. Va. Sept. 12, 2012) (granting default judgment under § 1692d(5) where defendant debt collector continued to call after consumer asked debt collector to stop calling); Jensen v. Omni Credit Servs. of Fla., Inc., No. 12-405, 2013 WL 1183317, at *1-2 (D. Or. Feb. 25, 2013) (report and recommendation) (granting default judgment under § 1692d(5) where plaintiff disputed debt and debt collector thereafter "continued to harass [p]laintiff with further calls"), adopted, 2013 WL 1183316 (D. Or. March 21, 2013).

### 2. Damages

With respect to damages, the FDCPA provides, in pertinent part, as follows:

> [A]ny debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of--
>
>> (1) any actual damage sustained by such person as a result of such failure;

34

>    (2)(A)  in  the  case  of  any  action  by  an
>    individual, such additional damages as the court
>    may allow, but not exceeding $1,000

15 U.S.C. § 1692k(a).  "In determining the amount of liability,"

§ 1692k(b) further provides that, "the court shall consider,

among other relevant factors[,] . . . the frequency and

persistence of noncompliance by the debt collector, the nature

of such noncompliance, and the extent to which such

noncompliance was intentional[.]"  Id. § 1692k(b)(1).  Finally,

actual damages are not a prerequisite to the recovery of

statutory damages.  See Miller v. Wolpoff & Abarmson, L.L.P.,

321 F.3d 292, 307 (2d Cir. 2003) ("The FDCPA provides for

liability . . . and permits the recovery of statutory damages up

to $1,000 in the absence of actual damages."); Keele v. Wexler,

149 F.3d 589, 593-94 (7th Cir. 1998) (same); Baker v. G.C.

Servs. Corp., 677 F.2d 775, 780 (9th Cir. 1982) ("There is no

indication in the statute that award of statutory damages must

be based on proof of actual damages."); see also Shoup v.

McCurdy & Chandler, LLC, 465 F. App'x 882, 885 (11th Cir. 2012)

(per curiam) (stating that the FDCPA "provides a claim for

statutory damages based on any violation of the statute.").


     Here, the complaint alleges that Finney suffered

"damages in the form of anger, anxiety, emotional distress,

fear, frustration, upset, humiliation, [and] embarrassment" as a

proximate result of MIG's "violations of the FDCPA," and
requests "actual damages[,] . . . statutory damages in an amount
up to $1,000[, and] . . . reasonable attorney's fees and
costs[.]"  Compl. ¶¶ 17-18.

        Nothing in the record supports an award of actual
damages in this case.  The factual pleadings in the complaint
concerning liability are accepted as true upon default, but
allegations with respect to damages are not.  S.E.C. v.
Lawbaugh, 359 F. Supp. 2d 418, 422 (D. Md. 2005) (citing Dundee
Cement Co. v. Howard Pipe & Concrete Prods., Inc., 722 F.2d
1319, 1323 (7th Cir. 1983)).  Although Finney claims that she
suffered a variety of dignitary harms as a result of MIG's debt
collection calls, she did not avail herself of the opportunity
to present damages at any of the three hearings scheduled by the
court for that purpose.  Moreover, nothing in her affidavit
(which constitutes the entire corpus of evidence outside the
pleadings in this matter[5]) substantiates or quantifies any of
these purported injuries.

        On the other hand, an award of statutory damages is
appropriate in this case.  As noted, the FDCPA permits the
recovery of statutory damages even in the absence of actual

---

[5] Counsel for the Estate has advised the court that there is no
need for a further hearing on damages in this matter.

damages.  _See, e.g._, _Miller_, 321 F.3d at 307.  And, on this
score, Finney's affidavit is of some use inasmuch as it
clarifies that MIG contacted her on over thirty occasions after
Palmer's letter requested that MIG cease communicating with her
about the alleged debt.  Accordingly, in light of the number of
calls and given that MIG's conduct would also have established a
violation of § 1692c, the court concludes that Finney is
entitled to $1,000 in statutory damages pursuant to
§ 1692k(a)(2)(A).  _See_ _Frazier v. Absolute Collection Serv.,_
_Inc._, 767 F. Supp. 2d 1354, 1365-66 (N.D. Ga. 2011) (adopting
report and recommendation) (awarding $1,000 in statutory damages
for "a handful" of FDCPA violations); _Obenauf v. Frontier Fin._
_Grp., Inc._, 785 F. Supp. 2d 1188, 1194-95 (D.N.M. 2011)
(awarding $300 in statutory damages for a single phone call in
violation of FDCPA); _Jensen_, 2013 WL 1183317 at *2 (awarding
$1,000 for some unspecified number of calls in violation of
FDCPA); _Hutchens v. West Asset Mgmt., Inc._, No. 11-996, 2013 WL
1337178, at *6 (S.D. W. Va. March 29, 2013) (awarding $1,000 in
statutory damages for FDCPA violations); _cf. also_ DIRECTV, Inc.
v. Huynh, 318 F. Supp. 2d 1122, 1129-31 (M.D. Ala. 2004)
(holding that a damages hearing is not necessary to calculate
statutory damages and awarding statutory damages on the basis of
affidavits and record evidence).

### 3. Attorney's Fees and Costs


Section 1692(a)(3) provides that, "in the case of any successful action to enforce" liability under the FDCPA, "the costs of the action, together with a reasonable attorney's fee as determined by the court" shall be awarded.  15 U.S.C. § 1692k(a)(3); Carroll v. Wolpoff & Abramson, 53 F.3d 626, 628 (4th Cir. 1995) (explaining that fee award under § 1692k is "mandatory in all but the most unusual circumstances").  As our court of appeals recently summarized:

> [T]he district court['s] . . . discretion in awarding attorney's fees [under the FDCPA] is guided by the twelve factors first set forth in Johnson v. Ga. Highway Express, Inc., and adopted by [the Fourth Circuit] in Barber v. Kimbrell's, Inc.  The Barber factors include such considerations as the time and labor required, the difficulty of the issues litigated, customary fees in similar situations, and the results obtained.  These factors, however, usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate[, i.e., the lodestar].  When . . . the applicant for a fee has carried his burden of showing that the claimed rate and number of hours [expended] are reasonable, the [lodestar] is presumed to be the reasonable fee contemplated by the statute.  The FDCPA, however, does not mandate a fee award in the lodestar amount, and the district court maintains the discretion to depart from it in appropriate circumstances.

Randle v. H&P Capital, Inc., 513 F. App'x 282, 283-84 (4th Cir. 2013) (per curiam) (internal quotation marks and citations omitted) (fourth, fifth, and sixth alterations in the original).

38

When calculating reasonable fees, establishing the hourly rate is generally the critical inquiry. Westmoreland Coal Co. v. Cox, 602 F.3d 276, 289 (4th Cir. 2010) (quoting Plyler v. Evatt, 902 F.2d 273, 277 (4th Cir. 1990) (internal citations and quotations omitted)). The fee applicant bears the burden of establishing the reasonableness of the requested rate. Id.

> In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award. Although the determination of a "market rate" in the legal profession is inherently problematic, as wide variations in skill and reputation render the usual laws of supply and demand largely inapplicable, the Court has nonetheless emphasized that market rate should guide the fee inquiry.

Id. (quoting Plyler, 902 F.2d at 277 (internal citations and quotations omitted)). In determining the market rate, the court should consider evidence of what attorneys earn for performing similar services in similar circumstances, "which, of course, may include evidence of what the plaintiff's attorney actually charged his client." Id. (quoting Depaoli v. Vacation Sales Assocs., L.L.C., 489 F.3d 615, 622 (4th Cir. 2007)).  Examples of the specific evidence that courts have found "sufficient to verify the prevailing market rates are affidavits of other local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the

relevant community." Id. (quoting Robinson v. Equifax Info.

Servs., LLC, 560 F.3d 235, 245 (4th Cir. 2009)).

        In this case, the Estate seeks to recover fees for

work performed by the attorneys and paralegal who have

represented Finney, and now the Estate, throughout the course of

this action.  Specifically, a timesheet attached to the motion

for default judgment indicates that three attorneys expended a

total of just under eleven and one-half hours of work on the

case, at a rate of $250 per hour, for a total fee of $2,854.

Additionally, a paralegal spent just over five hours on the

case, at a rate of $95 per hour, aggregating $483.  The

timesheet is accompanied by an affidavit attesting to its

accuracy as a record of the time expended in this matter.

        While the Estate has not submitted any information of

the prevailing market rate for similar services in the

community, the court is aware from its allowances in other

recent cases that the rate sought is reasonable.  In view of the

relatively modest amount sought, no further evidence of

reasonableness of rate is necessary.  Upon review, the court

also finds the time expended in this matter to be reasonable.

Cf., e.g., Nero v. Law Office of Sam Streeter, P.L.L.C., 655 F.

Supp. 2d 200, 212 (E.D.N.Y. 2009) (awarding fees for 9.2 hours

of work in FDCPA case following default judgment); Overcash v.

                                40

United Abstract Grp., Inc., 549 F. Supp. 2d 193, 197 (N.D.N.Y. 2008) (awarding fees for 11 hours of work in FDCPA case following default judgment).  Accordingly, the request for attorney and related paralegal fees is granted in the amount of $3,337.00, together with legal research fees of $36.53, aggregating $3,373.53.

        With respect to costs, several courts have concluded that § 1692k(a)(3) permits litigants to recover the costs allowed under 28 U.S.C. § 1920, which include filing fees and fees for service of process.  E.g., Hutchens v. West Asset Mgmt., Inc., No. 11-996, 2013 WL 1337178, at *6 (S.D. W. Va. March 29, 2013) (explaining that the "costs of the action" under § 1692k(a)(3) are "limited to the costs allowed under 28 U.S.C. § 1920" and collecting authority).  Here, the Estate seeks to recover a $350 filing fee and $40 service fee, both of which are recoverable.  Accordingly, the request for costs is granted in the amount of $390.

### IV.   Conclusion

Based upon the foregoing analysis, it is ORDERED as follows:

1. That the motion to substitute the Estate as plaintiff in this case be, and it hereby is, granted;

2. That the plaintiff's motion for default judgment be, and it hereby is, granted as to Count I of the complaint and otherwise denied;

3. That the plaintiff be, and hereby is, awarded against MIG Capital, Inc. the sum of $1,000.00 in damages;

4. That the plaintiff be, and hereby is, awarded against MIG Capital, Inc. the sum of $3,373.53 in attorney's fees; and

5. That the plaintiff be, and hereby is, awarded against MIG Capital, Inc. the sum of $390.00 in costs.

The Clerk is directed to forward copies of this order to all counsel of record and to the defendant, by certified mail, return receipt requested at 5811 Memorial Highway, Suite 206, Tampa, Florida, 33615.

DATED: March 27, 2014

John T. Copenhaver, Jr.
United States District Judge